UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-174-H

RUDELL JONES                                                                                      PLAINTIFF

V.

MILLER PIPELINE CORPORATION                                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Rudell Jones, has filed suit against Miller Pipeline Incorporated ("Miller Pipeline"), his former employer, alleging racial discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act.  Discovery is now complete and Miller Pipeline has moved for summary judgment.  The Court finds that the evidence falls far short of that necessary to proceed to trial on these claims.

I

Plaintiff was hired at Miller Pipeline on March 1, 2001 as a crew foreman.  He worked in that capacity until mid-December of 2002.  As a crew foreman, he was generally assigned to connect new gas services and to perform distribution maintenance for customers of Louisville Gas & Electric ("LG&E").  Like all foremen at Miller Pipeline, Plaintiff worked in a two-person crew.  He was assigned a helper to assist in completing assigned tasks.  The helper position was an unskilled labor position, with a starting pay rate of less than $12.00/hour.  At the time he was hired, Miller Pipeline operated ten two-person crews.  Plaintiff was the only African-American foreman.

During his employment at Miller Pipeline, Plaintiff was assigned five different helpers to work on his two-man crew. According to him, the crew-members assigned to him were unqualified and their work was inadequate. He claims that their inexperience and sub-par work adversely affected his own productivity. He says that his superiors ignored his complaints about these helpers, but responded immediately to the complaints of white foremen. He further alleges that he was forced to work with unsatisfactory employees because he was African-American.

The first person assigned to Plaintiff as a helper was William Rusty Brown ("Brown"). Brown was assigned to Plaintiff's crew in May of 2001. Plaintiff alleges that Brown consistently arrived between fifteen and forty-five minutes late to work, slept on the job, and failed to follow Plaintiff's orders. Plaintiff voiced his complaints to his supervisor, Stan Wiseman ("Wiseman"). But according to Plaintiff, Wiseman failed to take decisive action. Two months later, Wiseman transferred Brown to another department in the company but never fired or formally reprimanded him.

In July of 2001, Alex Combs ("Combs") was assigned to work as Plaintiff's helper. At the time he was hired, Combs had just one week of relevant experience with another employer. Combs habitually made personal calls on his cell phone, lasting up to twenty-five minutes while they were on the job. According to Plaintiff, Wiseman took no action in response to Plaintiff's complaints about Combs. Plaintiff admits that Combs was laid off after Plaintiff had complained about his performance. However, Plaintiff contends that the layoff was not in any way motivated by his repeated complaints. He contends that his complaints were ignored.

Nathaniel Anthony ("Anthony") was assigned to Plaintiff as a helper in June of 2002. Before working for Miller Pipeline, Anthony had six months of relevant experience at LG&E.

However, Anthony was hired at the same time as Tim Williams ("Williams"), who had twenty years of experience. Because Plaintiff referred Williams to the company, he asserts that Williams, the more experienced candidate, should have been assigned to him as a helper. While Anthony was on Plaintiff's crew, Plaintiff repeatedly complained that Anthony resisted his authority. Two weeks after he was hired, Anthony quit.

Danny Lawson ("Lawson") was Plaintiff's next helper. The son of another foreman at Miller Pipeline, Lawson was assigned to Plaintiff in September of 2002. According to Plaintiff, Lawson had a drug problem; he had been convicted of drunk driving three times; and he had a suspended driver's license. After three or four months of working with Lawson, Plaintiff complained to a supervisor at LG&E that Lawson's performance was unsatisfactory. But Miller Pipeline merely reassigned Lawson to another foreman; the company did not fire him.

Plaintiff's final helper was Chris Jentzen ("Jentzen"). Jentzen was assigned to him on December 15, 2002. Jentzen had worked as a helper on four other crews before transferring to Plaintiff's. Each of Jentzen's prior foremen had complained that Jentzen's work was inadequate. Plaintiff asserts that he felt threatened by Jentzen's presence. He felt that Jentzen was young and was prone to commit crimes. He felt so threatened by Jentzen's presence that he refused to go inside residential homes with Jentzen on the job. Plaintiff called his supervisor to complain but Wiseman brushed him off.

Plaintiff also alleges that unlike the white foremen, he was given no authority in making hiring decisions. When he was hired in March 2001, his supervisors at Miller Pipeline told him that he could refer potential employees to the Superintendent for possible placement as helpers. Accordingly, Plaintiff referred two applicants to Wiseman between February and October of

3

2001. However, neither of the applicants was assigned to his crew. He claims that white foremen, on the other hand, were allowed to recruit their own helpers.

Plaintiff alleges that on one occasion he encountered explicit racial bigotry while on the job. Sometime between July 2001 and April 2002, while he was riding in his truck with Combs, his helper at the time, he overheard Combs, a white male, tell someone on his cell-phone, "I work for Miller white boys." Plaintiff believed the statement to be racially charged. He reported what he heard to a supervisor at LG&E. But Miller Pipeline issued no response.

Plaintiff cites other work-related hardships that he allegedly suffered as evidence of harassment and discrimination. During the first six weeks of his employment with Miller Pipeline, between March and May 2001, he was not given proper work permits or equipment. His truck was routinely blocked in by other drivers when he reported to the Service Center in the morning in the fall of 2001.

He also claims that he was assaulted by another employee on November 30, 2001 and that Miller Pipeline failed to adhere to its internal harassment policies in response. On that morning, he was told to be at work by 6:00 a.m. As he was walking through the gate in the dark, someone ordered him to "'Turn around.'" Brown, who was not supposed to report to work until 7:30 ran toward him, getting within three feet of him. Brown said, "'What's up,'" and ran past him. Plaintiff admits that Brown never touched him. Plaintiff tried to file a formal complaint for harassment, claiming that Brown had intended to cut his throat. Miller Pipeline issued no response.

On December 18, 2002, Plaintiff left work because of a pain in his chest. His family doctor recommended that he take time off of work. Plaintiff passed this recommendation along

4

to Wiseman and Wiseman told Plaintiff, "'You take all the time you want off. ... But when you are ready to go back to work you let me know.'"

In January of 2003, Plaintiff met with three representatives from Miller Pipeline, including Wiseman, to discuss Plaintiff's return to Miller Pipeline. The representatives asked Plaintiff to return to work but he refused, saying that he did not want to work at Miller Pipeline because he felt threatened and because his complaints had never been resolved. Miller Pipeline's representatives offered to transfer him to another facility but he refused. After the meeting, he never again contacted anyone in an attempt to return to work.

On August 18, 2003, Plaintiff filed a discrimination claim against Miller Pipeline with the Equal Employment Opportunity Commission ("EEOC").

II

Summary judgment is appropriate if no genuine issue of material facts exists and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The issue is whether the evidence submitted presents a sufficient disagreement about the material facts so that submission to a jury is necessary, or whether the evidence is so one-sided that a party must prevail as a matter of law. *Id*. at 251-52. Based on this standard, Miller Pipeline is entitled to summary judgment with respect to Plaintiff's claims of racial discrimination and racial harassment.

III

To set forth a *prima facie* claim of racial discrimination under Title VII, an employee

must show that he: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was treated differently than similarly situated members outside of the protected class. *Singfield v. Akron Metropolitan Housing Auth.*, 389 F.3d 555, 561 (6th Cir. 2004).[1]

Here, Plaintiff does not allege that he was demoted or transferred, or that he suffered a wage decrease or material loss of benefits. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000) (defining "materially adverse change"). In fact, Plaintiff remained in his position at Miller Pipeline until his apparent resignation. In such circumstances, an adverse employment action exists only if that resignation amounted to a constructive discharge. *See, e.g., Koscis v. Multi-Care Mgmt, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). The Sixth Circuit's two-pronged test for constructive discharge requires "an inquiry into both the objective feelings of an employee, and the intent of the employer." *Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir. 1987). The objective component exists if "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982) (quoting *Bourque v. Powell Elec. Mfg.*, 617 F.2d 61, 65 (5th Cir. 1980)). Plaintiff's complaints are atypical of those even remotely approaching constructive discharge.

Even if Plaintiff faced some difficult and unpleasant working conditions, those conditions were far from being so severe as to compel a reasonable person to resign. Plaintiff complained that the helpers assigned to his crew were inexperienced, that they arrived late, that they failed to

---

[1] The Court uses federal Title VII standards to evaluate state race discrimination claims brought under Kentucky's Civil Rights Act. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000); *Stewart v. Univ. of Louisville*, 65 S.W.3d 536, 539 (Ky. Ct. App. 2001).

follow his orders, that they were easily distracted, and that at least one of them had a history of substance abuse. He alleges that he was not given proper work permits or equipment during the first six weeks of his employment, that he had to rent his own equipment on more than one occasion, and that he overheard a racially charged remark made by a co-worker on one occasion that was not directly addressed to him. The mere fact that a job becomes more difficult to tolerate does not create a constructive discharge. *Koscis,* 97 F.3d at 886 ("[A] change in employment conditions 'must be more disruptive than a mere inconvenience ....'" (*quoting Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Plaintiff further alleges that Miller Pipeline failed to respond to his complaints with sufficient attention based in part on its racial animus towards him. In theory, such an allegation could be relevant to a claim of constructive discharge. A court may take into account how the employer responded to a plaintiff's complaints in determining whether working conditions were so unpleasant that it would have been intolerable for a Title VII plaintiff to stay on the job while seeking redress. *See Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 29 (1st Cir. 2002) (affirming finding of constructive discharge where employer refused to take adequate corrective measures to protect employee from future sexual harassment). In this case, however, Plaintiff offers no evidence that Miller Pipeline responded to his complaints in an inadequate manner. Instead, Plaintiff's own evidence suggests just the opposite. Each time Plaintiff complained about the performance of his helpers, Wiseman took some action.[2] Moreover, Plaintiff has not

---

[2] He transferred Brown and Lawson to different crews within a few months of assigning them to Plaintiff's crew; he laid off Combs within nine months of hiring him; Anthony quit before Wiseman had a chance to fire or transfer him; and Jentzen had only worked with Plaintiff for three days before Plaintiff quit himself. Although Plaintiff contends that Wiseman responded more quickly to white foremen's complaints, he offers no actual evidence to support that assertion. Even if true, it would be unlikely to support a constructive discharge claim.

7

offered sufficient proof of the subjective element of the constructive discharge inquiry: that Miller Pipeline intended for Plaintiff to resign.  In fact, Plaintiff admits that Miller Pipeline actively sought to convince Plaintiff to return to work.  His supervisors went so far as to offer to transfer Plaintiff to another facility.

From the foregoing discussion, it is certain that Plaintiff cannot possibly prove that he was constructively discharged.  Accordingly, Plaintiff is unable to show that he suffered an adverse employment action.  The absence of an adverse employment action effectively resolves the case in Miller Pipeline's favor.

IV

Title VII recognizes hostile work environment claims based on racial harassment.  *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999).  "In order to establish a racially hostile work environment under Title VII, the plaintiff must show that the conduct in question was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and that the victim subjectively regarded it as abusive." *Smith*, 220 F.3d at 760.  In addition to satisfying both the objective and subjective elements of this standard, "[t]he plaintiff must also prove that his employer 'tolerated or condoned the situation,' or knew or should have known of the alleged conduct and did nothing to correct the situation." *Id.* (quoting *Jackson*, 191 F.3d at 659).

Courts must "determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of*

8

*Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788. In other words, the harassment must have "adversely affected the employee's ability to do his or her job." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999).

Plaintiff worked at Miller Pipeline for almost two years. During that time he encountered a single instance of alleged overt racial hostility. A white coworker's statement over the telephone within earshot of Plaintiff that he works for "Miller white boys" was explicitly racial and surely offensive; but its meaning and its intended audience were unclear. While an employee need not be the target of racist comments for a work environment to be so hostile as to violate Title VII, both the objective and subjective elements of the standard must be satisfied. One racist comment over the course of almost two years, which was not clearly directed at Plaintiff, does not constitute severe or pervasive harassment, even if he regarded it as abusive.

The only other claim that Plaintiff makes is that he endured continual harassment that, although not overtly racial, was motivated by racial bigotry. His truck was blocked in by other employees' cars. He was physically threatened by one of his coworkers. He was forced to rent equipment for the job. The truck he was assigned was in poor condition. These allegations are not obviously racial in nature. To be sure, such evidence could contribute to proof of a hostile work environment where one can show that the actions would not have occurred but for the fact that the plaintiff was African-American. *Jackson*, 191 F.3d at 662.[3]

---

[3] In *Jackson*, the plaintiff presented evidence that her supervisor had used a racial epithet against her and that a few days after he was suspended for having done so, he falsely accused her of breaking a company rule. *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999). The court found that although the false accusation was not overtly racial, the plaintiff had presented sufficient evidence to show that it would not have occurred but for her

However, Plaintiff did not present sufficient evidence that the alleged incidents would not have occurred but for his race. There is no evidence that the individuals who parked behind Plaintiff's truck did so because he was African-American. In fact, there is no evidence even as to the identity of those individuals. Plaintiff has not shown that the alleged assault was in any way tied to his race. Nor has he shown that the company's response to that alleged assault was related to his race. Simply put, there is no evidence that any of Plaintiff's treatment at work was causally connected to his African-American identity in any way. Therefore, summary judgment is appropriate.

The Court will enter an order consistent with this Memorandum Opinion.



cc:     Counsel of Record

---

race. *Id*.